UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | | |
|---|---|---|
| DEBORAH HUIETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 2:15-CV-125-JMH-HAI |
| v. | ) | |
| | ) | |
| JANET CONOVER, Warden, | ) | RECOMMENDED DISPOSITION |
| | ) | |
| Respondent. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

State prisoner Deborah Huiett has filed, through counsel, a petition for a writ of habeas corpus.  D.E. 1.  For the reasons explained below, the undersigned recommends that the petition be **DENIED** on the merits.

## I.  Background

Tina Rae Stevens was murdered in Kentucky in 1999.  In April 2000, a roadside cleaning crew found most of her remains in a dark blue garment bag at the bottom of a hill.  The initial target of the murder investigation was Thomas Jansen, Stevens's boyfriend at the time of her disappearance in May 2009.  Investigators' suspicion then pivoted toward her former boyfriend, Leonard Day, and his girlfriend, petitioner Deborah Huiett.  Day and Huiett faced separate jury trials, and were convicted.  The Commonwealth's theory was that Huiett stabbed Jansen in a fit of jealous rage, and that Day helped Huiett finish off the victim and dispose of her body.  Day was tried first and convicted of Stevens's murder.  His conviction is the subject of a pending habeas corpus petition in this court.  *See Day v. Beckstrom*, No. 2:14-CV-75-KKC-HAI.

Huiett was tried second, and was represented by public defender Rhonda Lause.  *See* D.E. 1 at 2.  The jury convicted Huiett of murder and tampering with physical evidence.  Ky. Rev.

Stat. §§ 507.020, 524.100.  The Kentucky Supreme Court affirmed her conviction and life sentence.  *Huiett v. Commonwealth*, No. 2005-SC-000643-MR, 2007 WL 4793688, at *1 (Ky. June 21, 2007).  She filed a timely motion for post-conviction relief, which the Boone Circuit Court denied after a two-day evidentiary hearing.  *Huiett v. Commonwealth*, No. 2012-CA-001824-MR, 2014 WL 1268695, at *3 (Ky. Ct. App. Mar. 28, 2014), *as modified on denial of reh'g* (Aug. 29, 2014).  The Kentucky Court of Appeals affirmed the Circuit Court's decision denying Huiett's constitutional claims, but remanded her case for reconsideration of her claim for DNA testing of blood samples from Jansen's car and hairs from the garment bag.  *Id*. at *11; Ky. Rev. Stat. § 422.285.

Huiett, through counsel, filed her federal habeas petition on June 24, 2015.  D.E. 1.  The Commonwealth responded.  D.E. 8.  Huiett replied.  D.E. 12.  Huiett raises one claim of governmental suppression of exculpatory evidence, three claims of ineffective assistance of counsel, and one Confrontation Clause claim.  Huiett raised her Confrontation Clause claim in her direct appeal to the Kentucky Supreme Court.  She raised the other five claims in her post-conviction motion.  The Kentucky courts denied all six claims on the merits.  *See Huiett*, 2007 WL 4793688, at *2-3; *Huiett*, 2014 WL 1268695, at *4-8.  The Commonwealth does not raise any procedural bar to any of Huiett's claims.

## II.  Standard of Review for State Habeas Cases

A state prisoner has a statutory right to collaterally attack her conviction or sentence.  *West v. Bell*, 242 F.3d 338, 346 (6th Cir. 2001).  A state prisoner may seek federal habeas corpus relief on the ground that she is being held in custody in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a).

The Antiterrorism and Effective Death Penalty Act, Pub L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), applies to all habeas corpus petitions filed after April 24, 1996, and requires "heightened respect" for legal and factual determinations made by state courts. *See Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). Section 2254(d), as amended by AEDPA, provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

This is a "highly deferential" standard of review that is "difficult to meet." *Cullen v. Pinholster*, 563 U.S. 170, 131 S. Ct. 1388, 1398 (2011). All of the state court's factual findings are presumed to be correct, and can be rebutted only by "clear and convincing evidence." *Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003), *cert. denied*, 543 U.S. 1080 (2005); 28 U.S.C. § 2254(e)(1). Legal conclusions made by state courts also receive substantial deference under AEDPA. "[A] federal habeas court may overturn a state court's application of federal law only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." *Nevada v. Jackson*, 569 U.S. ___, 133 S. Ct. 1990, 1992 (2013) (per curiam) (internal quotation marks omitted). Also, "circuit precedent does not constitute clearly established Federal law" under AEDPA. *Parker v. Matthews*, 567 U.S. ___, 132 S. Ct. 2148, 2155 (2012) (internal quotation marks omitted). In sum, "federal judges are required to afford state courts due respect by overturning their decisions

only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. ___, 135 S. Ct. 1372, 1376 (2015).

Therefore, the question before this Court is not merely whether the Kentucky courts were incorrect, but whether they were so wrong that their treatment of the law and facts was "unreasonable" under these deferential standards. The Court will consider Huiett's ineffective-assistance claims first, followed by her *Brady* claim and her Confrontation Clause claim.

### III.  Ineffective Assistance Claims

An ineffective-assistance-of-counsel claim presents a mixed question of law and fact. *Mitchell v. Mason*, 325 F.3d 732, 738 (6th Cir. 2003). To successfully assert an ineffective-assistance claim, a defendant must prove both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

To prove deficient performance, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A defendant meets this burden by showing "that counsel's representation fell below an objective standard of reasonableness" as measured under "prevailing professional norms" and evaluated "considering all the circumstances." *Id.* at 688. However, a reviewing court may not second-guess trial counsel's strategic decisions. *Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002). Thus, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotations omitted). "A fair assessment of attorney performance requires that every effort be made to

4

eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

In order to prove prejudice under the second prong of *Strickland*, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. When evaluating prejudice, courts generally must consider the "totality of the evidence." *Id.* at 695. Courts may approach the *Strickland* analysis in any order, and an insufficient showing on either prong ends the inquiry. *Id.* at 697.

The Supreme Court has repeatedly commented on the interaction between AEDPA deference under § 2254(d) and *Strickland's* standards of review. For example, in *Harrington v. Richter*, the Court emphasized that "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Under § 2254, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* Both standards are "'highly deferential' and when the two apply in tandem, review is 'doubly'" deferential. *Id.* at 105 (citations omitted). Under § 2254(d), "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Also, because the *Strickland* standard is a "general" standard, "the range of reasonable applications is substantial." *Id.*

5

In this case, the Kentucky Court of Appeals accurately described the *Strickland* standard and accurately allocated the burden to Huiett when it analyzed and denied her ineffective-assistance-of-counsel claims. Therefore, the Court must grant full double-deference to the state court's decision under § 2254(d).

### A. Failure to Secure Two Witnesses

The Supreme Court in *Strickland* recognized that counsel has a duty to conduct a reasonably thorough pre-trial investigation:

> [A lawyer's] strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland v. Washington*, 466 U.S. 668, 690-91 (1984); *see also Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003). Furthermore, the decision whether to call certain witnesses is the type of "strategic decision" that is generally not subject to review under *Strickland*. *Boykin v. Webb*, 541 F.3d 638, 649-50 (6th Cir. 2008) (Batchelder, J., dissenting) (collecting cases for this proposition).

Huiett claims she "received ineffective assistance of counsel when counsel failed to follow up on the witnesses who were the last to see Tina Rae Stevens alive." D.E. 1 at 15; D.E. 12 at 1. The witnesses she is referring to are Julio Serrano (a.k.a. Mike Cruz) and Marnell McRae. Serrano and Day (Huiett's codefendant) worked together as day laborers for a witness named Robert Walker around the time of Stevens's disappearance. Around the time Stevens disappeared, Huiett, Day, Walker, Walker's wife, and Serrano were all staying at the Suburban

6

Lodge in Florence, Boone County, Kentucky, while Walker's company performed a contract job laying cable. D.E. 1 at 7; D.E. 8 at 8-9. Marnell McRae was Serrano's girlfriend. D.E. 8 at 19.

Huiett refers to Serrano and McRae as "the last [people] to see Tina Rae Stevens alive." D.E. 1 at 15; D.E. 12 at 1. The Commonwealth argues this description is inapt. *See* D.E. 8 at 43 (arguing that other witnesses claimed to have seen Stevens after the day Serrano took her to a bus stop).

Regardless of who last saw Stevens alive, the Kentucky Court of Appeals properly described and applied *Strickland* and found that trial counsel was reasonably diligent in trying to track down these witnesses, and reasonable for ultimately deciding their testimony was unnecessary:

> [T]he record indicates [that Huiett's trial attorney Rhonda] Lause did conduct a reasonable pretrial investigation, because: (1) Lause tried to locate McRae and Serrano, (2) Lause was unable to locate them, largely due to Serrano's and McRae's efforts to avoid discovery, and (3) Lause determined, in her professional judgment, that neither witness's testimony would be helpful to the defense. Given Lause's inability to locate the witnesses despite her reasonable effort to do so, we cannot say that her decision to focus her resources elsewhere was unreasonable.

*Huiett v. Commonwealth*, No. 2012-CA-001824-MR, 2014 WL 1268695, at *6 (Ky. Ct. App. Mar. 28, 2014), *as modified on denial of reh'g* (Aug. 29, 2014).

The Court of Appeals explained the basis of its holding:

> Lause testified that she dispatched her investigator, Paul Flinker, to locate the couple. Flinker was an experienced investigator with extensive law enforcement experience, previously serving as a Covington Police officer from 1972 until 1996. Flinker attempted to trace Serrano's and McRae's locations using old addresses, phone numbers, and rental applications, but he was unsuccessful. At the evidentiary hearing, Flinker testified to performing comprehensive searches on databases for criminal records, property records, and financial records that he later cross-referenced. Describing his investigative efforts, Flinker said that he had "watched every video at least twice" and "read every document at least twice" over the period of a year, and that he had spent "hundreds of hours" investigating leads in Huiett's defense.

7

Despite Flinker's efforts, Lause was unable to locate Serrano and McRae, due in part to their efforts to conceal their identities. Flinker traced McRae's and Serrano's old phone numbers and addresses, discovering that the phone numbers were either disconnected or reassigned and that the addresses were not current. Flinker also discovered that Serrano had used several aliases, fake social security numbers, and birthdays to conceal his identity. McRae had also listed several different birthdays on documents. Both McRae and Serrano had good reason to conceal their identities: Serrano was a convicted felon on the run from felony drug charges for several years, and McRae had a bench warrant in Boone County that had been outstanding since 1999.

Even if the witnesses had been located, Lause did not believe their testimony would have been helpful to the defense. Flinker testified that he and Lause often discussed investigative strategy and that Lause would direct his inquiries to support her overall defense. Eventually, Lause told Flinker to focus on other leads.

Lause testified that she did not believe Serrano's testimony would be helpful to the defense because there was substantial evidence that the murder took place about a week after Serrano saw Stevens, and there was other evidence that placed Stevens at the Suburban Lodge at a date later than Serrano saw her. Nor would McRae's testimony have been pivotal in Hueitt's defense. Lause said that she did not spend much time tracing all the possible sources of the garment bag because many alternative theories regarding the bag's origin existed, including that it belonged to Jansen, and that the bag containing Stevens' remains was the same "dark blue, almost black" bag that housekeepers witnessed hanging in Huiett's room at the Suburban Lodge. Given Lause's strategy to attack the Commonwealth's timeline, details regarding the bag were ancillary, and expending further resources to locate a witness who could only refute one possible theory of the bag's origin was not critical to her defense. Therefore it was reasonable for Lause to decide to focus her and her investigator's efforts elsewhere once initial efforts to find the witnesses had failed.

*Id*.

Because the Court Appeals correctly cited and applied *Strickland's* standards pertaining to pre-trial investigations, its decision was not contrary to Supreme Court precedent. And, even though Huiett contends that Serrano's and McRae's testimony *could have been* important at trial, Huiett has not convinced this Court that the Court of Appeals's thoroughly-reasoned opinion is an unreasonable application of *Strickland*. Trial counsel's decision to give up the search for the witnesses in light of the difficulty in finding them and the relative unimportance of their

testimony is precisely the type of "strategic" decision that *Strickland* dubs "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Huiett's contention that her counsel failed to appreciate the potential significance of these witnesses' testimony does not necessarily mean that the counsel's investigation was flawed in any respect. And Huiett has identified no omission, error, or oversight in the investigation that would create such a flaw within the double-deference framework that applies.

Huiett argues that "[w]e know based on their testimony at the [post-conviction] evidentiary hearing that [Serrano and McRae] would have testified favorably for Huiett." D.E. 12 at 5. This is the type of reliance on "hindsight" that *Strickland* counsels courts to avoid. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). The Kentucky Court of Appeals performed this sort of fair assessment and found no deficient performance. That court's opinion on the matter was not wrong beyond reasonable dispute, s*ee Woods v. Donald*, 575 U.S. ___, 135 S. Ct. 1372, 1376 (2015), and must be upheld. There is no need to consider prejudice.

### B. Alternative Perpetrator

Huiett argues her trial counsel was "ineffective for failing to present evidence concerning Thomas Jansen as an alternate suspect." D.E. 1 at 18; D.E. 12 at 1. Huiett points out that Jansen was originally the "prime suspect" in Stevens's death. D.E. 1 at 18. She argues,

> Jansen had been dating Stevens at the time of her disappearance, and Jansen's car had blood on the driver's side rear door, along with women's clothing on the floorboard near the front, passenger seat. Jansen told a girlfriend that he did not know if he had killed Stevens, but told police he had owned a bag like the one in which Stevens' remains were recovered, and believed that was, in fact, his

> garment bag.  Counsel offered none of this evidence at trial, such that the jury was
> left without information concerning a compelling alternate suspect.

*Id.*  The Commonwealth disputes aspects of this recitation of facts.  *See* D.E. 8 at 21-22 (noting that the blood in Jansen's car tested negative for female DNA), 37 (noting that Jansen denied under oath that he told his girlfriend "he did not know if he had killed Stevens," and that Jansen's girlfriend testified similarly at Day's trial).  But the specific evidence against Jansen ultimately matters not because the state court reasonably found that Huiett's trial counsel reasonably chose a trial strategy other than the alternative-perpetrator defense.

At the post-conviction evidentiary hearing, trial counsel explained that her defense strategy "focused on attacking the Commonwealth's lack of physical evidence implicating Huiett, and challenging the Commonwealth's timetable of events leading up to and following the murder.  Lause argued that it was impossible for Huiett to kill, dismember, and dispose of Stevens within the timeframe alleged by the Commonwealth."  *Huiett*, 2014 WL 1268695, at *3. The Kentucky Court of Appeals found this trial strategy was a reasonable strategic choice.  *Id.* at *4.  Trial counsel "considered presenting Jansen as an alternate suspect," the court explained.  *Id.* But she decided against it "because in her judgment (1) Jansen would credibly deny his involvement if called as a witness, (2) a jury had already rejected that same theory in Day's trial, and (3) she could refer to Jansen, as well as others, as potential suspects to bolster her attack on the Commonwealth's timeline.  *Id.* at *5.[1]

---

[1] Regarding (1), trial counsel had interviewed Jansen and concluded he would not be a helpful witness because he came across as credible and genuinely affectionate toward the victim.  D.E. 1 at 19; D.E. 8 at 35.  Regarding (2), as this Court's Recommended Disposition in Leonard Day's case explains, "the strategy of [Day's] defense, beginning with the opening statement at trial, was to present Thomas Jansen to the jury as an 'alternative perpetrator' in the murder of Tina Stevens." *Day v. Beckstrom*, No. 2:14-CV-75-KKC-HAI (D.E. 15 at 11).  However, Day's counsel failed to subpoena Jansen.  *Id.* at 12.  The trial court excluded certain testimony concerning Jansen's alleged incriminating statements because the defense failed to prove Jansen was "unavailable" under Kentucky Rule of Evidence 804(b)(3).  *Id.* at 11-12.  Thus, Huiett correctly points out that the state court's reliance on (2) is not as strong as it might appear at first blush because Day's alternative perpetrator defense was weakened by the

The Kentucky Court of Appeals also pointed out that Huiett's "numerous incriminating statements" were a "serious obstacle" to a credible alternate-perpetrator defense. *Huiett*, 2014 WL 1268695, at *5. Faced with "her client's propensity for bragging about killing and dismembering Stevens," it was

> reasonable for [Lause] to conclude that focusing on how Huiett *could not* have committed the murder was a superior strategy. Certainly, Lause's choice of strategy forced her to forgo proffering every piece of evidence incriminating Jansen, but "when counsel focuses on some issues to the exclusion of others, there is a strong presumption that [s]he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, [540 U.S. 1, 8 (2003)].

*Id*.

Although Huiett now argues that counsel's decision "deprived [her] of her strongest defense," D.E. 1 at 19, this is a matter of opinion regarding trial strategy. The Court of Appeals was not objectively unreasonable when it determined that Lause's choice to pursue an impossibility defense was itself reasonable. *Huiett*, 2014 WL 1268695, at *5. Indeed, the appellate court also emphasized that the alternative-perpetrator theory was not wholly absent from Huiett's trial:

> instead of putting Jansen on the stand, Lause strategically chose to implicate Jansen in the crime by cross-examining the Commonwealth's witnesses; she believed the strategy would be more effective in her overall defense. Lause referred to Jansen in opening statements and cross-examined Detective Kenner thoroughly about his investigation of Jansen. Moreover, Lause adduced evidence of other suspects in an attempt to cast suspicion elsewhere. Lause cross-examined Detective Kenner regarding Stevens' activities as a drug-user and prostitute to infer that she may have been murdered by her clients. Lause also questioned Detective Kenner regarding a man named "Gary" who may have been violent with Stevens in the past. So while Lause did not focus solely on the Jansen theory, she did present Jansen, and others, as possible suspects to the jury to infer that Stevens could have been killed by several different people.

*Id*. at *4.

---

evidentiary limitations surrounding Day's alleged incriminating statements. It remains true, however, that the Jansen-as-perpetrator theory was presented to the jury in Day's case, and that it failed to elicit an acquittal.

The Court of Appeals's thorough and articulate opinion on this issue was neither an unreasonable application of, nor contrary to, *Strickland*. Nor has Huiett made a showing of an unreasonable determination of the facts.

Huiett leans on *Chambers v. Mississippi*, 410 U.S. 284, 296, 93 (1973); *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007); and *Williams v. Anderson*, 460 F.3d 789, 804 (6th Cir. 2006), for the proposition that counsel was ineffective for "failing to present the compelling evidence of Jansen as an alternative suspect." D.E. 1 at 20. In *Chambers*, defense counsel knew that a man named McDonald had confessed, and "endeavored to show the jury that McDonald had repeatedly confessed to the crimes." *Id*. at 289. The Supreme Court found that the trial court's decision to exclude much of this evidence violated due process. *See id*. at 294-303. This case is distinguishable from *Chambers* because Huiett's attorney made a *strategic* decision not to call Jansen as a witness. Instead, counsel introduced other evidence that implicated Jansen, even though the alternative perpetrator theory was not Huiett's main defense.

In *Richey*, the Court of Appeals found that defense counsel was ineffective for doing "next to nothing" to evaluate the forensic-science evidence that was "fundamental to the State's case." *Richey*, 498 F.3d at 362. The attorney had hired an expert consultant, but "then either willfully or negligently k[ept] himself in the dark about what that expert [was] doing" and the basis for the expert's opinion. *Id*. at 362-63. In this case, Huiett's attorney did investigate Jansen, and even personally interviewed him. D.E. 1 at 19. *Richey* is not on point. Neither is *Williams*. In that case, the Court of Appeals found deficient performance on account of defense counsel's "complete failure to investigate and present mitigation [evidence]" for the death-penalty phase of the capital trial. *Williams*, 460 F.3d at 803. Again, this case does not present an alleged failure to investigate regarding the alternative perpetrator theory. The question before

the Kentucky Court of Appeals was whether counsel's *strategic* decision to pursue a different defense theory (and to not call Jansen as a witness) was objectively unreasonable. *Richey* and *Williams* have little bearing on this issue.

The Court of Appeals found no deficient performance in regard to Huiett's alternative perpetrator claim. Applying AEDPA deference, its decision must stand. There is no need to inquire into prejudice.

## C. Impeachment Concerning the Garment Bag

Huiett argues her counsel "performed deficiently in failing to impeach Detective Kenner about the identification and ownership of the garment bag in which Stevens' remains were found." D.E. 1 at 21; D.E. 12 at 1. The Commonwealth's original theory regarding the provenance of the garment bag was that it was Jansen's, and he received it from his mother. *See* D.E. 8 at 17-18, 22-24. The bag was a High Sierra bag brand, a type that had been sold at Lazarus department stores. *Id*. at 17. When Det. Kenner interviewed Jansen the detective claimed—untruthfully—that he had definitively traced the bag to him. *Id*. at 18. According to Huiett, Jansen replied to Det. Kenner that the bag was probably the one his mother gave him for Christmas, but that he did not put Stevens's body in the bag. *See id*. at 23; D.E. 1 at 22. Det. Kenner mentioned this conversation at trial, but testified on redirect that his statement to Jansen was a lie designed to trick him into incriminating himself. *See* D.E. 1 at 21. Huiett argues that "Detective Kenner was never impeached on this point." *Id*. According to Huiett, her trial counsel should have more strongly connected the bag to Jansen, because this would have better established the alternative-perpetrator defense. *Id*. at 23.

As the investigation progressed, the Commonwealth's theory about the origin of the garment bag evolved away from Jansen and toward Serrano and McRae. Huiett's cellmate

ultimately testified at trial that Huiett told her the bag had come from Serrano's girlfriend (McRae), who had worked at Lazarus. *See* D.E. 1 at 22. Accordingly, the prosecutor in closing arguments suggested that McRae could have stolen the bag from Lazarus and eventually given it to Huiett. *Id*. at 23. Huiett points out that when Serrano and McRae eventually testified at the post-conviction evidentiary hearing, it was revealed that although they had given Huiett a bag, it was a "Marlboro" bag. *Id*. at 10-11, 14.

> The Kentucky Court of Appeals dealt with this issue as follows:

> Even in hindsight, it is difficult to see how not impeaching Detective Kenner was error. Detective Kenner stated he lied to Jansen during that interview by telling him he had traced that exact bag back to Jansen. However, in reality, Detective Kenner had only discovered that the *type* of bag was made by High Sierra and sold at Lazarus between 1993 and 1995. Detective Kenner stated both at trial and at the evidentiary hearing that his statement to Jansen was false and a mere ploy to trap Jansen. Had Lause impeached Detective Kenner on this point, the detective could have further explained that his statements were merely an interrogation tool, and thus damaged Lause's ability to infer that Jansen was a possible killer. Further, impeaching Detective Kenner with that evidence may have made Lause appear overly contentious or unfamiliar with the case report, thus impairing her credibility with the jury. Lause's decision regarding what questions to ask a witness is matter of trial strategy which is entitled to deference under *Strickland* because given the circumstances, it was not objectively unreasonable.

*Huiett*, 2014 WL 1268695, at *7.

Under AEDPA, the question for this Court "is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). The Kentucky Court of Appeals articulated such a reasonable argument in support of its decision. That court's decision regarding deficient performance on this issue was not an unreasonable application of, or contrary to, *Strickland*. There is no need to examine prejudice.

## IV. *Brady* Claim

Huiett argues she "was denied due process of law under the Fifth and Fourteenth Amendments of the U.S. Constitution when the Commonwealth withheld exculpatory information regarding [Serrano] and McRae." D.E. 12 at 1; D.E. 1 at 7.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

> Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the case would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. The *Brady* standard is not met if the petitioner shows merely a reasonable possibility that the suppressed evidence might have produced a different outcome.

*Wogenstahl v. Mitchell*, 668 F.3d 307, 323 (6th Cir. 2012) (internal citations and quotation marks omitted). Thus, to assert a successful *Brady* claim, a habeas petitioner must show that: (1) the evidence was favorable to the petitioner, (2) it was suppressed by the government, and (3) the petitioner suffered prejudice. *Id*. The suppression by the government may be willful or inadvertent. *Irick v. Bell*, 565 F.3d 315, 321 (6th Cir. 2009).

Huiett states that Serrano and McRae were listed as potential witnesses in the Boone County Sheriff's Office Investigation Report. D.E. 1 at 7. However, she claims, "the investigation report does not contain interviews or contact information for either individual. Detective Kenner interviewed both [Seranno] and [McRae], but never made these interviews part of his report and failed to disclose these interviews to defense counsel." *Id*.

At the post-conviction evidentiary hearing, Det. Kenner initially testified that he had not made contact with Serrano and could not recall ever speaking with McRae. He testified that "he

had talked to [Serrano's] former employer, Robert Walker and had made attempts to find [Serrano] and McRae, but he had been unable to ever locate them." D.E. 1 at 9.

However, on re-direct examination, "Kenner was confronted with excerpts from recorded phone calls between him and Robert Walker." D.E. 1 at 9; *see also Huiett*, 2014 WL 1268695, at *8. Det. Kenner told Walker during one of these calls that he had "talked to [Serrano]," and that he "got to talk to [McRae] on the phone . . . I had talked with her and I talked with him on the phone. The local police up there went and got them for me." *Id*. at 10. Det. Kenner also told Walker that he had originally been told that Day and Huiett obtained the blue garment bag from Serrano, "but when I talked to [McRae] she said no and [Serrano] said no, if you got it he stole it, [Day] would have had to have stolen it, he said, [Day] and [Huiett] both had a habit of going to the mall and stealing a lot." *Id*. Serrano and McRae both testified at the post-conviction hearing that they had spoken to an officer on the phone. *Id*.

Huiett claims that this information Det. Kenner obtained from Serrano and McRae was never included in the police report or provided to defense counsel. D.E. 1 at 12. Had Serrano's and McRae's testimony been presented at trial, she argues, it "would have presented an entirely different version of events which would have undercut the Commonwealth's timeline as presented." *Id*. Huiett's argument regarding prejudice is similar to her failure-to-investigate claim relating to Serrano and McRae: their testimony at trial would have been exculpatory because Serrano "saw the victim alive during the Commonwealth's time frame" and McRae's testimony would have disproved "the origin of the garment bag" because McRae testified at the evidentiary hearing that she had only given Huiett a "Marlboro bag." D.E. 12 at 2.

The Kentucky Court of Appeals rejected this claim on basis that the Commonwealth did not suppress the evidence:

In order to be considered "*Brady* material," there must be actual "material" for the prosecution to disclose. *See Bell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008) (*en banc*) (quoting *Todd v. Schomig*, 283 F.3d 842, 849 (7th Cir. 2002)).

Regardless of whether actual recordings of these interviews existed, the Commonwealth did fulfill the obligations imposed by *Brady*. Prior to trial, the Commonwealth provided the defense with Detective Kenner's entire report as well as recordings of the phone conversations in which Detective Kenner told Walker that he had interviewed McRae and Serrano. This disclosure identified McRae and Serrano—a fact made more evident because Detective Kenner listed McRae's and Serrano's names under the heading marked "Witnesses" in his case report. Further, it communicated the nature of their potential testimony, because Detective Kenner described to Walker his interviews with McRae and Serrano. By listening to those tapes, the defense had information that McRae and Serrano denied loaning Huiett a garment bag.

By handing over the tapes, the Commonwealth provided counsel with the same knowledge that would have been provided if Detective Kenner had created a summary of his interviews, albeit that knowledge was disclosed in a different form. While *Brady* requires the prosecution disclose exculpatory information, it does not constitutionalize a *carte blanche* pretrial discovery right. *Weatherford v. Bursey*, [429 U.S. 545, 97 (1977)]. Here, to hold that the Commonwealth violated *Brady*, we would necessarily say the violation did not stem from the Commonwealth's failure to *disclose* information, but instead from Detective Kenner's failure to affirmatively document information in a manner the defense would deem acceptable. Such a holding would extend the Commonwealth's *Brady* responsibilities beyond disclosure and instead, dictate the form by which a detective must document his reports, thus creating the type of discovery requirement explicitly rejected by the United States Supreme Court. The Commonwealth did not violate *Brady* because there was no failure to disclose information to Huiett. We need not consider whether the evidence in question is material.

*Huiett*, 2014 WL 1268695, at *8.

Huiett argues that the Court of Appeals's analysis "flies in the fac[e] of" *Banks v. Dretke*, 540 U.S. 668 (2004), and *United States v. Tavera*, 719 F.3d 705 (6th Cir. 2013), cases that stand for "the proposition that the Commonwealth and courts cannot impose a 'due diligence' rule on the defense." D.E. 12 at 3.

In *Banks*, the state had withheld two key pieces of information from the capital murder defendant. First, a key witness lied three times on the witness stand and stated he had not spoken

to anyone about his testimony implicating the defendant. In fact, he had been "intensively coached" by the state. *Banks*, 540 U.S. at 677-78. Prosecutors allowed the witness's misstatements to stand uncorrected, and argued in closing that the witness "brought you absolute truth." *Id*. at 678. Second, another key witness testified that he had never taken money from police or given police officers a statement. In fact, he was a paid informant. The state did not correct the misinformation. *Id*. The second witness also testified in the penalty phase of the capital trial. Twice again he perjured himself by denying he was an informant. *Id*. at 679. Again, the prosecutor told the jury the witness had been "open and honest . . . in every way." *Id*. at 681, 702.

The federal habeas court in *Banks* ordered an evidentiary hearing and ordered disclosure of the prosecutor's files. *Banks*, 540 U.S. at 684-85. Among those files was a transcript of an interrogation of the first untruthful witness. "The transcript revealed that the State's representatives had closely rehearsed [the witness's] testimony." *Id*. at 685. Also at the hearing, a Deputy Sheriff acknowledged that the second witness was a paid informant. *Id*. The transcript and the fact that the second witness had been an informant were not disclosed to defense counsel before the trial.

The Supreme Court analyzed the *Brady* claims under the pre-AEDPA "regime" for habeas corpus. *Banks*, 540 U.S. at 689. The Court noted that the state had, under its "open file policy," promised to disclose all *Brady* material. *Id*. at 692-93, 695. The state in *Banks* argued that defense counsel should have conducted a more thorough investigation of the second perjurious witness prior to filing for federal habeas relief. *Id*. at 695. The Supreme Court rejected this argument; its prior decisions "lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such

material has been disclosed." *Id*. A rule declaring that "'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Id*. at 696.

In *Tavera*, the government failed to make a critical disclosure of exculpatory evidence before Tavera's jury trial. The government withheld the fact that Tavera's codefendant had told the prosecutor during plea negotiations that Tavera had no knowledge of the drug conspiracy for which they were both charged. *Tavera*, 719 F.3d at 707-08. The government argued that Tavera (who was incarcerated) or his attorney should have performed "due diligence" and interviewed the codefendant independently. *Id*. at 711. The court rejected the idea that the defense bears any burden of discovering exculpatory information when that information is in the hands of the government. *Id*. Rather, *Brady* places the duty to disclose exculpatory evidence on the government, which possesses a "superior . . . investigatory apparatus" that defendants lack. *Id*. at 712.

This is not a case like *Banks* or *Tavera*. As the Kentucky Court of Appeals found, the Commonwealth did not withhold information that Huiett's counsel could only have otherwise discovered by conducting her own investigation. The Sheriff's Office and the prosecutor delivered the discovery materials to the defense. Those materials listed Serrano and McRae as potential witnesses. The materials included a recording of Det. Kenner's phone call with Walker in which he states that the potential witnesses denied giving Day or Huiett the garment bag. Nothing suggests that the Commonwealth possessed any information about Serrano seeing

Stevens "alive during the Commonwealth's time frame." That information only came to light during the post-conviction evidentiary hearing. *See* D.E. 12 at 2.[2]

Furthermore, as discussed in part III.A, trial counsel knew about Serrano and McRae. The defense investigator worked diligently to locate and contact these potential witnesses, but failed to do so because they were taking pains not to be found. The fact that defense counsel was diligently pursuing Serrano and McRae shows that their identities and potential value as witnesses were *not* suppressed by the government. The discovery materials provided by the Commonwealth gave defense counsel enough information about Serrano and McRae that counsel considered them, at least initially, worthy of tracking down.[3]

For these reasons, this Court cannot find that the Kentucky court's cogent analysis and resolution of this issue was an unreasonable application of, or contrary to, *Brady*.

## V. Confrontation Clause Claim

Under the Confrontation Clause, every criminal defendant has the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Supreme Court in *Crawford* held that whenever "testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Otherwise, testimonial evidence is constitutionally inadmissible. *Davis v. Washington*, 547 U.S. 813, 821 (2006).

---

[2] Huiett argues that Det. Kenner's disclosure "makes no mention of Serrano's assertion that he dropped the victim off at a bus stop in Covington." D.E. 12 at 3. This is an odd argument under *Brady* because Huiett never suggests that Det. Kenner knew this information. It was only "revealed" during "[p]ost-conviction investigation." *Id.* at 2.

[3] There is an additional reason why *Banks* and *Tavera* are not on point. Huiett states that these cases stand for the proposition that "courts cannot impose a 'due diligence rule' on the defense." D.E. 12 at 3. However, Huiett's argument on this point is that Det. Kenner was required under *Brady* to "memorialize his interviews" with Serrano and McRae. *Id.* In other words, Huiett's argument is that Det. Kenner inadequately recorded the fruits of his investigation. *Banks* and *Tavera* involved total suppression of evidence that was either clearly exculpatory or useful for impeachment of key witnesses. These cases do not impose a duty upon government investigators to memorialize every conversation that occurs as part of an investigation. Nor has Huiett identified any authority justifying habeas relief pursuant to such a theory.

Huiett raised her Confrontation Clause claim in her direct appeal to the Kentucky Supreme Court. *See* D.E. 8-3 at 21-30. The issue concerns trial testimony by Day's former cellmate Rudy Lopez. Day himself did not testify at trial; he had invoked his Fifth Amendment privilege against self-incrimination. *Huiett v. Commonwealth*, No. 2005-SC-000643-MR, 2007 WL 4793688, at *2 (Ky. June 21, 2007); D.E. 1 at 24. According to Huiett,

> Prior to Lopez being called to the stand, the trial court ordered a recess and held a bench conference to discuss the parameters of Lopez's testimony. The Commonwealth stated that, according to Lopez, Day had said something to the effect of, "[Huiett] cut her up but she didn't do shit right, so I had to finish her off." The Commonwealth proposed that Lopez be allowed to testify to the redacted statement "I finished her off." The court thought that the proposal went too far because the statement "I finished her off" implied a confederate. The judge also stated that, if the statement were allowed, it would "get us in some serious water."

D.E. 1 at 24 (record citations omitted).

However, during his testimony, Lopez testified that Day said "he had to finish her off." Defense counsel objected and requested a mistrial. *Id.* Another bench conference ensued, after which the trial court refused to grant a mistrial and declined to give a curative instruction. As the Kentucky Supreme Court explained regarding the post-testimony bench conference,

> on further reflection the judge denied [Huiett's] motion for a mistrial for the following specific reasons: 1) the statement did not mention [Huiett]; 2) the language could mean no more than what happens when a hunter shot a deer that had run off wounded; and 3) the jury did not have to read into the statement "any accusation towards [Huiett]." The prosecutor had warned the witness not to make the statement and no claim was made that it was improperly elicited. In the trial court's view the important distinction preventing a mistrial was that the statement did not refer to [Huiett]. With this in mind, the trial court feared that giving an admonition would "draw an inference that's not necessarily already there." No admonition was requested because the defense took the position that the testimony was incurable.

> What the trial court said before hearing the testimony and after hearing it did differ. However, the trial court's final view of the matter after hearing the

testimony in context was better informed than when hearing only a proposed statement out of context. His view of the actual evidence has more weight than an anticipated statement. The strongest inference that could be drawn from the actual testimony is that some unnamed person may have injured the victim, left her to die, and that Day "had to finish her off." That inference certainly would not be sufficient to convict [Huiett], who was not mentioned in the statement. It in no way identified her as a confederate. In fact, the statement is equally consistent with Day himself having to finish what he started. The trial court did not err in denying the motion for mistrial. There is no reasonable possibility that this statement affected the verdict, and even if it were error, it would be harmless.

*Huiett*, 2007 WL 4793688, at *2-3.

The Kentucky Supreme Court did not cite any law related to the Confrontation Clause, even though Huiett argued the claim under that Clause (*see* D.E. 8-3 at 21). It appears the court determined that (1) there was no error, and (2) if there was an error, regardless of its nature, Lopez's errant testimony was harmless under the circumstances. *See* Fed. R. Crim. P. 52(a) ("Any error . . . that does not affect substantial rights must be disregarded.").

Under AEDPA review, this Court is not concerned with whether the state court cited the correct legal basis for finding no error. *Early v. Packer*, 537 U.S. 3, 8 (2002). A state court is not required to cite—or even be aware of—the "governing law" established by the federal Supreme Court. *Id*. Instead, the question is whether the state court's ruling on this issue was inconsistent with clearly established federal law. *Id*. When the state court fails to cite the controlling legal precedents, "AEDPA's highly deferential standard requires that this court give the state-court decision 'the benefit of the doubt.'" *Slagle v. Bagley*, 457 F.3d 501, 514 (6th Cir. 2006) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

In light of the fact that Huiett briefed this issue in the state court as a Confrontation Clause claim, and applying "the benefit of the doubt," it appears the Kentucky Supreme Court held that the Confrontation Clause was not violated. *Slagle*, 457 F.3d at 514. That court's "result and reasoning are consistent with Supreme Court precedent." *Id*. Specifically, the state

court's ruling was consistent with the Supreme Court's *Crawford* and *Davis* cases because the hearsay statement offered by Lopez was non-testimonial and therefore was not covered by the Confrontation Clause.[4]

The Confrontation Clause applies only to testimonial hearsay. "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis*, 547 U.S. at 821. "Testimonial evidence" encompasses solemn declarations and affirmations "made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51.

> An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

*Id*.

The statement at issue is Day's statement—reported through Lopez—that Day "had to finish [Stevens] off." *See* D.E. 1 at 24. This statement was not testimonial under any of the definitions offered by the Court in *Crawford*. *See Crawford*, 541 U.S. at 51-52. When Day made the statement at issue, he was speaking to a cellmate. This was a classic "casual remark to an acquaintance," not a statement that Day "would reasonably expect to be used prosecutorially." *Id*. at 51. Nor was it, for example, "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*. at 52. Because the hearsay statement was non-testimonial, its admission did not implicate the

---

[4] Huiett additionally relies on *Bruton v. United States*, 391 U.S. 123 (1968) (reversing when the trial court admitted a codefendant's hearsay statement to a postal inspector that implicated the defendant). D.E. 1 at 25; D.E. 10 at 9. But, as the Commonwealth points out, the hearsay statement made by a codefendant in *Bruton* would have been testimonial under *Crawford* and *Davis*. D.E. 8 at 48. *Bruton* does not help Huiett because Day's statement to Lopez was non-testimonial.

Confrontation Clause. The Kentucky Supreme Court was therefore not unreasonable in concluding that there had been no error.

Even if the testimony's admission was constitutional error, the error would be harmless. A Confrontation Clause error is not the type of "structural error" that requires automatic reversal. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006). Instead, *on federal habeas review*, such an error is subject to analysis under the harmless error standard of *Brecht*. *Vasquez v. Jones*, 496 F.3d 564, 575 (6th Cir. 2007). The *Brecht* standard will uphold a conviction unless the error had a "substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

The Kentucky Supreme Court indicated that the "finish her off" line could not have had a substantial and injurious effect because it facially did not implicate Huiett in the murder. *Huiett*, 2007 WL 4793688, at *3. Huiett "was not mentioned in the statement," the court found. *Id*. The statement "in no way identified her as a confederate. In fact, the statement is equally consistent with Day himself having to finish what he started." *Id*. There was therefore "no reasonable possibility that this statement affected the verdict, and even if it were error, it would be harmless." *Id*. This harmless error analysis was not erroneous.

Huiett argues that the Kentucky Supreme Court's harmless error analysis is "illogical" and unreasonable because the Commonwealth's theory throughout the trial was "that Day and Huiett committed this crime together." D.E. 12 at 9. The implication is that the jury surely would have assumed that Huiett was the one who started what Day claimed to "finish." Assuming this is true, the state court's decision was not so off-base as to be unreasonable. The government's key evidence consisted of Huiett's "many incriminating statements and admissions made . . . to several witnesses." *Huiett*, 2007 WL 4793688, at *2. If the jury surmised that

24

Huiett was the one who started what Day said he "finish[ed]," it likely did so based on these multiple admissions by Huiett rather than anything intrinsic to the statement itself.

The decision of the Kentucky Supreme Court on this issue was not contrary to or an unreasonable application of the United States Supreme Court's clearly established law on the Confrontation Clause. Because Day's hearsay statement reported by Lopez is non-testimonial, it does not implicate the Confrontation Clause. Even if it did, any error in admitting the statement would be harmless under the *Brecht* standard because the statement neither mentioned nor implicated Huiett. It was relatively unimportant to the government's case, and was unlikely to have had a substantial effect on the jury's decision.

## VI. Conclusion

Huiett has not shown that the Kentucky courts were unreasonable in rejecting her claims under *Strickland*, *Brady*, and the Confrontation Clause. The undersigned therefore **RECOMMENDS** that her 28 U.S.C. § 2254 petition be **DENIED** on the merits.

The Court further **RECOMMENDS** that no Certificate of Appealability ("COA") should issue. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires a petitioner to demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). In other words, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id*.

In this case, the well-reasoned opinions of the Kentucky courts are entitled to capacious deference under AEDPA. Reasonable jurists would not find that these courts rendered "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Huiett's claims are insufficiently viable to deserve encouragement to proceed further.

The Court further finds that no hearing is warranted. The Circuit Court held a two-day evidentiary hearing on Huiett's state post-conviction motion, and Huiett largely relies on evidence deduced at that hearing. She did ask this Court in her original petition to "[o]rder such hearings as may be necessary." D.E. 1 at 26. But she never argued that such a hearing was actually necessary. In any event, review under § 2254 is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Evidence introduced in federal court has "no bearing" on § 2254 review. *Id*. at 185. Thus, this Court would be barred from considering any additional evidence in addressing Huiett's claims.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Recommended Disposition, issued under subsection (B) of the statute. *See also* Rules Governing Section 2254 Proceedings, Rule 8(b). Within fourteen days after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, *de novo*, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

This the 23rd day of March, 2016.

Signed By:

*Hanly A. Ingram*

**United States Magistrate Judge**